**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DBMP LLC; JOHNSON & JOHNSON; PECOS RIVER TALC, LLC; RED RIVER TALC, LLC; J-M MANUFACTURING CO., INC.; THE DOW CHEMICAL COMPANY; ROHM AND HAAS COMPANY; and UNION CARBIDE CORPORATION, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2025-0404-JTL |
| DELAWARE CLAIMS PROCESSING FACILITY, LLC; ARMSTRONG WORLD INDUSTRIES, INC. ASBESTOS PERSONAL INJURY SETTLEMENT TRUST; THE BABCOCK & WILCOX COMPANY ASBESTOS PI TRUST; CELOTEX ASBESTOS SETTLEMENT TRUST; FEDERAL-MOGUL ASBESTOS PERSONAL INJURY TRUST; THE FLINTKOTE ASBESTOS TRUST; OWENS CORNING FIBREBOARD ASBESTOS PERSONAL INJURY TRUST; OWENS-ILLINOIS ASBESTOS PERSONAL INJURY TRUST; PITTSBURGH CORNING CORPORATION ASBESTOS PERSONAL INJURY SETTLEMENT TRUST; UNITED STATES GYPSUM ASBESTOS PERSONAL INJURY SETTLEMENT TRUST; and WRG ASBESTOS PI TRUST, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION DENYING MOTIONS TO DISMISS**

Date Submitted: August 14, 2025
Date Decided: October 24, 2025

Kelly E. Farnan, Blake Rohrbacher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs.*

Gregory M. Gordon, Daniel B. Prieto, JONES DAY, Dallas, Texas; Morgan R. Hirst, JONES DAY, Chicago, Illinois; *Counsel for Plaintiffs DBMP LLC, Johnson & Johnson, Pecos River Talc, LLC, and Red River Talc, LLC.*

Allison M. Brown, Kristen R. Fournier, KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Plaintiffs The Dow Chemical Company, Rohm and Haas Company, and Union Carbide Corporation.*

Frank Fletcher, J-M EAGLE, Los Angeles, California; *Counsel for J-M Manufacturing Co., Inc.*

K. Tyler O'Connell, Kirsten A. Zeberkiewicz, Alena V. Smith, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Defendants Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust; The Babcock & Wilcox Company Asbestos PI Trust; Celotex Asbestos Settlement Trust; Federal-Mogul Asbestos Personal Injury Trust; The Flintkote Asbestos Trust; Owens Corning Fibreboard Asbestos Personal Injury Trust; Owens-Illinois Asbestos Personal Injury Trust; Pittsburgh Corning Corporation Asbestos Personal Injury Settlement Trust; United States Gypsum Asbestos Personal Injury Settlement Trust; and WRG Asbestos PI Trust.*

Edwin J. Harron, Kevin A. Guerke, Lauren Dunkle Fortunato, Renae P. Pagano, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Defendant Delaware Claims Processing Facility, LLC.*

**LASTER, V.C.**

The plaintiffs regularly face asbestos litigation, and one of them is trying to address its asbestos-related liabilities through bankruptcy. When defending against asbestos claims, the repeat litigants invariably seek to learn whether the claimant suffered other asbestos exposures. The existence of other exposures can reduce the named defendants' liability, facilitate a more favorable settlement, or open an avenue to seek contribution or indemnification.

Many former asbestos manufacturers filed for bankruptcy and, as part of their plans of reorganization, created settlement trusts to handle existing and future claims. Parties with claims against the former debtors cannot sue in court; they must apply for compensation from the settlement trusts. After handling claims for decades, the settlement trusts have amassed repositories of information about asbestos claims.

The repeat litigants invariably subpoena the settlement trusts for information about other potential exposures. At least fifteen states have enacted statutes providing that the claims data is relevant and discoverable. Courts overseeing high-volume asbestos dockets have entered case management orders to the same effect.

The defendants here are ten settlement trusts created to process asbestos claims, plus an entity to which many settlement trusts have outsourced the claims-handling function. In January 2025, they gave notice to their past claimants that they intended to implement new document retention policies starting on April 15, 2025. The policies generally contemplate that on a rolling basis, any data relating to resolved claims will be destroyed after one year. Implementing the policies will cause

the destruction of the vast bulk of the existing claims data. Going forward, the ongoing operation of the policies will curtail the available claims data.

The repeat litigants filed this action seeking a declaratory judgment that the claims processors have a duty to preserve the claims data. To implement that declaration, they seek a permanent injunction barring the claims processors from implementing the data policies.

The claims processors moved to dismiss the complaint. First, they argue that this court lacks subject matter jurisdiction. The repeat litigants seek permanent injunctive relief and previously sought preliminary injunctive relief that the claims processors rendered moot by stipulating to maintain the status quo. This court has subject matter jurisdiction to hear the dispute.

Second, the claims processors say the repeat litigants lack standing to sue because the data polices cannot hurt them. To the contrary, it is reasonably conceivable that the repeat litigants will suffer harm because they no longer will be able to obtain claims data. It is reasonably conceivable that without access to the claims data, the repeat litigants will lose more cases and settle more claims for larger payouts. Relatedly, the claims processors argue that an injury from the non-retention of documents is not cognizable. Generally, that would be true, but in the unique circumstances of this case, it is reasonably conceivable that the repeat litigants face a concrete injury that this litigation can remedy.

Finally, the claims processors argue that the repeat litigants cannot state a claim on which relief can be granted. They can. Courts of equity have long possessed

the authority to grant a bill of discovery. Through that equitable device, a court of equity can assist a petitioner in securing evidence for use in a pending or contemplated civil proceeding. The complaint pleads facts sufficient to support a reasonable inference that the repeat litigants could obtain a bill of discovery. At the pleading stage, that is all that is required.

The motion is denied. The case can proceed past the pleading stage.

## I.  FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference.[1] At this procedural stage, the court must credit the complaint's allegations along with all reasonable inferences.

### A.  The Harm Caused By Asbestos

Asbestos is a generic term for naturally occurring minerals offering high tensile strength and durability, while also exhibiting high resistance to heat, fire, electricity, and corrosion. Once thought to be a miracle material, asbestos found many

---

[1] Citations in the form "Compl. ¶ ___" refer to paragraph in the operative complaint. Citations in the form of "Opening Br. ___" refer to The Trust Defendants' Opening Brief in Support of Motion to Dismiss Verified First Amended Complaint for Declaratory and Injunctive Relief, Dkt. 32. Citations in the form of "Answering Br. ___" refer to Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss, Dkt. 34. Citations in the form of "Defs.' Suppl. Br. ___" refer to Trust Defendants' Supplemental Submission on the Authorities Identified by the Court, Dkt. 63.

commercial applications, including insulation, automotive brakes and clutches, ceiling and floor tiles, dry wall, roof shingles, and cement.[2]

Over time, scientists determined that asbestos can cause serious health problems. Exposure to the ambient level of asbestos in the environment poses little risk, but people who work with asbestos-containing products or asbestos itself face serious health risks.[3] High levels of exposure can result in many types of lung disease.[4] One is mesothelioma, a malignant cancer of the lining around the lungs. Mesothelioma is invariably fatal and causes death by suffocation, often within a few months of diagnosis.[5]

Exposure to asbestos typically occurs by inhaling airborne fibers. Although theoretically one exposure is enough to cause disease, more frequent exposures increase the likelihood and severity of disease. The nature of asbestos exposure, however, makes it difficult to know when the disease-causing event occurred. Moreover, mesothelioma and other asbestos-related disease have long latency

---

[2] *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 75 (Bankr. W.D.N.C. 2014); *see also* H.R. Rep. No. 103-835 § 111, at 40 (1994) [hereinafter House Report]; U.S. Dep't of Health & Hum. Servs., *Toxicological Profile for Asbestos* § 1.3 at 3–4 (2001) [hereinafter *Toxicological Profile*].

[3] *Toxicological Profile* § 1.3 at 3.

[4] *Id.* § 3.2.1 at 25; *see also* Nat'l Cancer Inst., *Asbestos Exposure and Cancer Risk* (2021), https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/asbestos/asbestos-fact-sheet (last visited Aug. 19, 2020).

[5] *Toxicological Profile* § 1.6 at 6; *Garlock*, 504 B.R. at 75.

4

periods—with a median latency period of thirty-five years.[6] Although more extensive exposure can shorten the latency period, asbestos-related diseases rarely develop in less than ten years.[7]

Because many industrial and commercial applications used asbestos extensively before scientists and the public understood its toxicity, asbestos has caused or contributed to the deaths of millions of Americans. Asbestos miners, insulation workers, automobile mechanics, and maintenance workers have been particularly hard hit.

## B.    Litigation Against Asbestos Miners and Major Manufacturers

As injured individuals or their surviving family members learned about the effects of asbestos, they brought tort lawsuits seeking compensation. For the claimants, the long latency periods created unique difficulties in proving liability and damages. Injured claimants also could have been exposed to different manufacturers' products at different times and different places, further complicating their cases.

To overcome those problems, the typical tort claimant in an asbestos lawsuit names thirty to one-hundred defendants. If liability is established, damages are

---

[6] *Garlock*, 504 B.R. at 76; *accord* House Report 40.

[7] *Garlock*, 504 B.R. at 76; *accord Toxicological Profile* § 3.2.1.7 at 49.

apportioned among the liable parties according to principles that vary across jurisdictions.[8]

The initial asbestos plaintiffs were asbestos miners who sued their employers. Other early plaintiffs worked in plants manufacturing asbestos-based insulation. The defendant who originally faced the most asbestos litigation was Johns-Manville Corporation ("Manville"), the manufacturer with the largest market share for asbestos-based insulation and other asbestos products. Virtually every asbestos-related complaint named Manville as a defendant, and Manville generally led the defense. When Manville filed for bankruptcy in 1982, the company had been named in 12,500 lawsuits and expected to be named in another 50,000 to 100,000 cases. As part of its reorganization, Manville created and funded a settlement trust to compensate present and future claimants. Manville also obtained what is now known as a "channeling injunction" that required all present and future asbestos claimants to submit claims to the settlement trust rather than suing Manville in court.[9]

In 1994, Congress amended the bankruptcy code to facilitate asbestos-related reorganizations.[10] The amendment allowed a debtor facing substantial asbestos-

---

[8] *See* Laura Kingsley Hong & Robert E. Haffke, *Apportioning Liability in Asbestos Litigation: A Review of the law in Key Jurisdictions*, 26 T. M. Cooley L. Rev. 681, 682–83 (2009).

[9] House Report 40–41.

[10] Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111 (1994) (codified as amended at 11 U.S.C. § 524(g)); *see* House Report 40.

related liabilities to establish a Manville-style settlement trust that would assume the debtor's liability for "damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products."[11] The amendment also authorized the channeling injunction that the Manville reorganization introduced.[12]

With Congress having created a path, other major manufactures of asbestos-based insulation followed it, including Celotex Corporation, Eagle Picher, and Keane Corporation. Like Manville, those companies reorganized, formed settlement trusts, and obtained channeling injunctions.[13]

After the major asbestos-product manufacturers exited the court system, asbestos plaintiffs began pursuing smaller manufacturers. From 2000 to 2005, the remaining manufacturers of asbestos-based insulation reorganized, created settlement trusts, and obtained channeling injunctions. Those companies included Owens Corning Fibreboard, Pittsburgh Corning, U.S. Gypsum, Babcock & Wilcox, Federal Mogul, Turner & Newell, Armstrong World Industries, and W.R. Grace.[14]

---

[11] 11 U.S.C. § 524(g)(2)(B)(i)(I).

[12] 11 U.S.C. § 524(g)(2)(B)(i); *see* House Report 40–41.

[13] *See Garlock*, 504 B.R. at 83.

[14] *See id*. Some commentators estimate that by 2047, when the asbestos scourge will have mostly run its course, several hundred thousand deaths will have resulted from asbestos exposure, and over 10,000 corporations will have been named as defendants, leading to over 100 bankruptcies. *See* Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tulane L. Rev. 1071, 1075–76 (2014).

Ten of the eleven defendants here are settlement trusts created through the reorganizations of asbestos-based insulation manufacturers, including Armstrong World Industries, Babcock & Wilcox, Federal-Mogul, Owens Corning Fibreboard, Pittsburgh Corning Corporation, USG Corporation, and W.R. Grace.[15]

## C. The Shift Towards Other Product Manufacturers

With the principal manufacturers of asbestos-based insulation having exited the court system, asbestos claimants began suing the manufacturers of other asbestos-containing products, such as gaskets, pumps, automotive brake pads, and residential construction materials.[16] Asbestos claimants could also submit claims to the settlement trusts, but features of the trusts led to strategic behavior.

When creating a settlement trust, a debtor had to estimate its total potential exposure to asbestos-related claims. The claims fell into two categories. The first category encompassed claims from people directly injured by the debtor's products ("Direct Claimants"). The second category encompassed claims from other defendants who had compensated Direct Claimants were seeking contribution or indemnification ("Indirect Claimants").[17] The debtor's assets were insufficient to compensate all

---

[15] Compl. ¶¶ 26, 39.

[16] *See* Brickman, *supra*, at 1082–85; *Garlock*, 504 B.R. at 75–81; Mark A. Behrens, *Asbestos Trust Transparency*, 87 Fordham L. Rev. 107, 108 (2018).

[17] *See, e.g.*, Answering Br. Ex. B §§ 1.140, 1.142, 1.207, 1.216, 2.6, 5.6 [hereinafter Owens Corning Chapter 11 Plan]. For a list of comparable provisions in the Chapter 11 plan documents of the other trust defendants, see Answering Br. 22–23 n.14.

claimants. The plan of reorganization therefore established a rate at which all claimants could recover, such as fifty cents on the dollar. By contrast, in the court system, a claimant could recover one hundred cents on the dollar from a solvent defendant.

In light of the different rates of recovery, lawyers representing asbestos claimants have an incentive to prioritize claims against solvent defendants. They also have an incentive to argue that, relative to the settlement trusts, the solvent defendants bear greater responsibility for the claimants' injuries and must pay a greater share of the liability. Efforts to shift liability towards solvent defendants might involve stressing the number and extent of exposures to their products while downplaying the number and extent of exposures to bankrupt manufacturers' products.[18]

Those efforts need not involve fraud. Evidentiary uncertainties about the frequency, extent, and causal role of different exposures provide ample room for good faith advocacy.[19] Unfortunately, cases of actual fraud exist, with some lawyers withholding evidence of exposure to bankrupt manufacturers' products until after obtaining recoveries through the court system.[20]

---

[18] Compl. ¶¶ 7–8.

[19] *See, e.g.*, Colloquium, *Asbestos Bankruptcy Trusts and Their Impact on the Tort System*, 7 J.L. Econ. & Pol'y 281, 295–96 (2010).

[20] Compl. ¶ 8; *see Garlock*, 504 B.R. at 84 ("Most significant to Garlock [a gasket manufacturer], though, was the fact that often the evidence of exposure to those

9

Solvent defendants have the opposite incentives. They can seek to minimize their own liability by identifying and emphasizing a claimant's exposures to products made by bankrupt manufacturers. To do that, they need information about what a claimant's other exposures might be.

At first blush, it might seem as if asbestos claimants could provide the information themselves, but that is often not the case. Long latency periods mean memories fade. Moreover,

> [s]ince asbestos plaintiffs are often testifying about exposures that occurred many decades prior, they often rely on their lawyers to refresh their recollection. Because asbestos personal injury cases are focused on solvent defendants, those are the only exposures the plaintiff's lawyers has an incentive to discuss with the client. The result is that discovery in tort cases often yields incomplete information about a plaintiff's trust-related exposures.[21]

The solvents defendants need sources of information that could reveal other exposures or establish patterns involving particular industries, time periods, job sites, and products.[22]

One source of information could be the lawyers who represent the asbestos claimants. Over time, attorneys specializing in asbestos cases have developed

---

insulation companies' products also 'disappeared.' This occurrence was a result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries from Garlock (and other viable defendants)."); *accord* Brickman, *supra*, at 1112–26.

[21] Behrens, *supra*, at 121 (footnotes omitted).

[22] *See Garlock*, 504 B.R. at 92–93.

10

repositories of information from investigating and pursuing claims.[23] In many cases, the attorneys representing the claimants have more information about likely exposures than the claimants themselves.[24] But attorneys on the plaintiffs' side understandably resist providing that information. In *Garlock*, the court found that the difficulties the debtor faced in obtaining information were so great that it declined to treat the debtor's history of settlements as a reliable basis to estimate the debtor's potential liability.[25]

For solvent defendants, the settlement trusts constitute the only realistic source of information about other potential exposures and their severity. Any claimant submitting a proof of claim to a settlement trust must provide information about work history, job responsibilities, evidence of product use, and other potential

---

[23] *Id.* at 82 ("As cases are worked up over years of practice, plaintiffs' lawyers develop evidence of asbestos exposure at certain job sites or in certain occupations—from product records, worker depositions and the like. Consequently, in many instances, the exposure evidence is under the control of the plaintiffs' lawyer rather than the plaintiff."); *see* Hong & Haffke, *Apportioning Liability*, *supra*, at 683–84.

[24] *See* Colloquium, *Asbestos Bankruptcy Trusts and Their Impact on the Tort System*, 7 J.L. Econ. & Pol'y 281, 291 (2010) (defendants' attorney James L. Stengel speaking) ("One of the values of the plaintiffs bar gives to their clients is with today's claimants: if you're a seventy-eight year old gentleman with mesothelioma, you probably know where you worked, and you have some surmise as to who may be responsible there. But frankly, it's the plaintiffs bar who can help educate them as to what products they've been exposed to, and which of those products contain asbestos. There's a whole store of intellectual property at the plaintiffs bar level that's not immediately apparent, and those claimants may not know that they have a claim, say against Union Carbide [(which is a defendant in this action)], my client, until they actually talk to a plaintiff's lawyer."); *accord Garlock*, 504 B.R. at 82.

[25] *See Garlock*, 504 B.R. at 74.

exposures, including witness statements (the "Claims Data"). After decades of processing claims, the settlement trusts possess Claims Data that can reveal when and where asbestos exposures took place involving which asbestos-related products and which manufacturers.

To obtain Claims Data, solvent defendants routinely subpoena the settlement trusts.

## D. The Claim Processors And Their Data Policies

Ten of the eleven defendants are settlement trusts created to process and pay claims. The eleventh is the Delaware Claims Processing Facility, LLC, an entity that many settlement trusts have retained to handle the claim processing function. This decision calls them the "Claim Processors."

By January 2025, the Claim Processors had adopted data policies that generally contemplated only retaining Claims Data for one year after a claim was resolved (the "Data Policies"). If implemented, the Data Policies would result in the destruction of the vast majority of existing Claims Data. Going forward, the Claim Processors would only retain Claims Data for a short period.

On January 15, 2025, the Claim Processors sent notices to their current and past claimants informing them that the Data Policies would go into effect on April 15. The notices stated that the Claim Processors were implementing the Data Policies to protect the claimants' privacy and guard against data breaches.

In March 2025, the plaintiffs here learned about the notices. They are DBMP LLC, Johnson & Johnson, Pecos River Talc, LLC, Red River Talc, LLC, J-M

12

Manufacturing Co., Dow Chemical Company, Rohm and Haas Company, and Union Carbide Corporation. They have distinction of being the defendants most commonly sued at present by asbestos claimants (collectively, the "Repeat Litigants").

The Repeat Litigants concluded that the Data Policies would eviscerate their ability to obtain Claims Data to defend against asbestos claims. On April 1, 2025, the Repeat Litigants asked the Claim Processors not to implement the Data Policies. The Claim Processors refused.

The Repeat Litigants contend that decision to implement the Data Polices resulted from self-interested conduct by leading plaintiffs lawyers. When a plan of reorganization creates a settlement trust, the primary creditor constituency is typically the class of Direct Claimants. The lawyers who represent Direct Claimants are well positioned to bargain over the terms of the trust, including who serves as the trustee, who populates the trust oversight committee whose approval is necessary for significant actions, and who serves as the representative of future claimants. The Repeat Litigants contend that the plaintiffs' lawyers have secured the appointment of trustees and future claimant representatives who favor their interests. They also contend that the plaintiffs' lawyers have secured positions on the oversight committees. The Repeat Litigants believe that the plaintiffs' lawyers used their influence to obtain the Data Policies—at least in part—to impair the Repeat Litigants' ability to defend against asbestos claims.

**E.    This Litigation**

The Repeat Litigants filed this lawsuit on April 14, 2025. The complaint asserted a single claim for a declaratory judgment establishing that the Claims Processors have a duty to preserve the Claims Data. To implement that declaration, the Repeat Litigants seek permanent injunctive relief preventing the Claim Processors from failing to retain the Claims Data.

To block the implementation of the Data Policies while this litigation was pending, the Repeat Litigants sought a preliminary injunction and moved for expedited proceedings. The Claim Processors mooted that application by stipulating that the Data Policies would not go into effect while the litigation is pending. On April 24, 2025, the court approved the stipulation as an order.

The Claim Processors subsequently moved to dismiss the complaint. They contend that this court lacks subject matter jurisdiction over this action, that the Repeat Litigants lack standing, and that the Repeat Litigants have failed to state a claim on which relief can be granted.

## II.    SUBJECT MATTER JURISDICTION

The Claim Processors initially moved to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1). Subject matter jurisdiction refers to a court's "authority to adjudicate the type of controversy involved in the action."[26]

---

[26] Restatement (Second) of Judgments § 11 (A.L.I. 1982).

The Court of Chancery possesses limited subject matter jurisdiction. The court "can acquire subject matter jurisdiction in the first instance by three different means: (1) the invocation of an equitable right; (2) a request for an equitable remedy when there is no adequate remedy at law; or (3) a statutory delegation of subject matter jurisdiction."[27]

"The party seeking the Court's intervention bears the burden of establishing jurisdiction."[28] The court determines whether it has subject matter jurisdiction by looking at the face of the complaint.[29] But a court is not bound by the complaint's allegations.[30] The court must conduct its own independent assessment to determine whether subject matter jurisdiction exists.

## A.    Subject Matter Jurisdiction Over The Remedy Sought

The Repeat Litigants initially ground subject matter jurisdiction on their request for an equitable remedy. When considering that basis for jurisdiction, the

---

[27] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 973 (Del. Ch. 2016) (internal quotation marks omitted).

[28] *Shore Invs., Inc. v. BHole, Inc.*, 2009 WL 2217744, at *2 (Del. Ch. July 14, 2009).

[29] *Diebold Comput. Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 590 (Del. 1970).

[30] *See* 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1206 [hereinafter Wright & Miller]. Before 2024, the Court of Chancery Rules did not require that a party plead subject matter jurisdiction. Rule 8 now requires that a complaint contain "a short and plain statement of the grounds for the Court's subject-matter jurisdiction," conforming the rule to its federal counterpart. Ct. Ch. R. 8(a)(1); *cf.* Fed. R. Civ. Pro. 8(a)(1).

15

court "must look beyond the remedies nominally being sought, and focus upon the allegations of the complaint in light of what the plaintiff really seeks to gain by bringing his or her claim."[31] On top of requesting an equitable remedy, the plaintiff must lack an adequate remedy at law.[32] A remedy at law is adequate if it "will afford the plaintiffs full, fair and complete relief."[33] If the plaintiff possesses a non-equitable remedy that is "complete, practical and efficient," then a request for an equitable remedy cannot support jurisdiction.[34]

The Claim Processors should not have contested subject matter jurisdiction based on the remedy sought. The Court of Chancery has "jurisdiction over requests for interim injunctive relief necessary to maintain the status quo."[35] The Repeat Litigants sued for injunctive relief, including a preliminary injunction to prevent the Claim Processors from implementing the Data Policies and deleting the Claims Data

---

[31] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004).

[32] *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Corp.*, 669 A.2d 36, 39 (Del. 1995)

[33] *Hughes Tool Co. v. Fawcett Publ'ns, Inc.*, 315 A.2d 577, 579 (Del. 1974).

[34] *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991) (internal quotation marks omitted).

[35] *E.I. du Pont de Nemours & Co. v. Bayer CropScience, L.P.*, 2008 WL 2673376, at *2 (Del. Ch. July 2, 2008); *accord City of Wilm. v. Addicks*, 47 A. 366, 374 (Del. Ch. 1900) (describing a request for an injunction to "maintain[] the status quo" pending a determination of the parties' legal rights as "a familiar and unquestioned ground of equitable jurisdiction").

before the case could be litigated. The Claim Processors would not have paused their efforts absent this lawsuit and the request for a preliminary injunction. That request provided ample basis for this court to exercise subject matter jurisdiction.

The Claim Processors now argue that because they agreed not to implement the Data Policies while this litigation was pending, they rendered the preliminary injunction application moot and prevented the request for a preliminary injunctive relief from providing a basis for subject matter jurisdiction. That argument is frivolous.

A court derives its subject matter jurisdiction from the constitutional or statutory provisions that create the court and give it authority.[36] "[S]ubject matter jurisdiction may not be created by waiver or by agreement of the parties. Similarly, such an agreement also may not restrict or eliminate subject matter jurisdiction that is otherwise present."[37] Once equitable subject matter jurisdiction exists, it continues throughout the case. "While it is true that subsequent events may moot a cause of

---

[36] Restatement (Second) of Judgments § 11 cmt. a.

[37] 2 Moore's Federal Practice—Civil § 12.30[1], Lexis+ (2025); *see Gandhi-Kapoor v. Hone Cap. LLC,* 307 A.3d 328, 338 (Del. Ch. 2023) ("Because a court's subject matter jurisdiction derives from a grant of sovereign authority, parties cannot alter it by private ordering."), *aff'd sub nom. CSC Upshot Ventures I, L.P. v. Gandhi-Kapoor,* 326 A.3d 369 (Del. 2024); *Kroll v. City of Wilm.,* 2023 WL 6012795, at *14 (Del. Ch. Sept. 15, 2023) ("Subject matter jurisdiction concerns this court's powers, not the parties' rights. Therefore, parties may not waive the existence or non-existence of subject matter jurisdiction."); *de Adler v. Upper N.Y. Inv. Co. LLC,* 2013 WL 5874645, at *8 (Del. Ch. Oct. 31, 2013) ("The Court's subject matter jurisdiction cannot be determined by contract, by consent in the pleadings, or even by procedural waiver." (footnotes omitted)).

action, such events do not operate to divest a court of its jurisdiction once that jurisdiction attaches."[38]

"A request for injunctive relief clearly constitutes equitable relief over which this Court has jurisdiction."[39] The request must be bona fide, and here it was. The parties commendably agreed to preserve the status quo and avoid the need for a hearing on the Repeat Litigants' application for a preliminary injunction, but that agreement did not deprive the court of subject matter jurisdiction.[40] The agreement could not retroactively change the fact that when the Repeat Litigants filed suit—the point when jurisdiction is measured—the Repeat Litigants had sought a preliminary injunction, needed injunctive relief to preserve the status quo, and would have

---

[38] *Heathergreen Commons Condo. Ass'n v. Paul*, 503 A.2d 636, 645 (Del. Ch. 1985); *see Tull v. Turek*, 147 A.2d 658, 665 (Del. 1958) ("[O]nce equity has acquired jurisdiction of a cause, it will retain that jurisdiction to give final relief to end the controversy. This remains the rule even though circumstances have arisen after the filing of the complaint which make the equitable relief prayed for impracticable." (citing 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 237(e) (Spencer W. Symons ed., 5th ed. 1941) [hereinafter Pomeroy])).

[39] *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *2 (Del. Ch. Nov. 5, 2004); *Cont'l Auto. Sys., Inc. v. Nokia Corp.*, 2023 WL 1370523, at *21 (Del. Ch. Jan. 31, 2023).

[40] *Cf. Weiner v. Miller*, 1990 WL 54915, *1 (Del. Ch. Apr. 27, 1990) ("Simple cessation of an actionably wrongful activity does not remove this Court's ability to grant injunctive relief. Injunctive relief is obviously prospective in nature, focusing on what the defendant is likely to do in the future."); 43A C.J.S. *Injunction* § 24 (2025) ("The grant of, or the refusal to grant, an injunction invokes the court's equitable powers. Although there are expressions to the contrary, the authority of a court to grant writs of injunction is generally an inherent one that antedates specific legislative sanction." (footnotes omitted)).

18

obtained it had the Claim Processors not agreed to it. Despite their protests to the contrary, the Claim Processors conceded the need for injunctive relief by agreeing to it.

That should have ended the matter. But assuming that the parties' agreement could somehow prevent the court from considering the request for a preliminary injunction as a basis for jurisdiction, the Repeat Litigants also seek a permanent injunction preventing the Claim Processors from deleting the Claims Data. The Claim Processors respond with a series of arguments about why the request for a permanent injunction cannot support jurisdiction.

First, the Claim Processors assert that a request for a permanent injunction cannot support equitable jurisdiction because a declaratory judgment standing alone constitutes an adequate remedy at law. Seeking a declaratory judgment does not change the jurisdictional inquiry. The Declaratory Judgment Act neither adds to nor subtracts from a court's subject matter jurisdiction.[41] The act "merely provides a

---

[41] *Reeder v. Wagner*, 2007 WL 3301026, at *1 (Del. Ch. Nov. 1, 2007) ("It is well settled that the Declaratory Judgment Act does not independently confer jurisdiction on this court."); *E. Shore Env't, Inc. v. Kent Cnty. Dep't of Plan.,* 2002 WL 244690, at *4 (Del. Ch. Feb. 1, 2002) (finding subject matter jurisdiction over a claim for declaratory judgment claim when independent basis for asserting equitable jurisdiction exists); *see* 10 *Del. C.* § 6501 ("[C]ourts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed."); *see also* Unif. Declaratory Judgment Act pmbl. (1922) ("[The Declaratory Judgment] does not take anything from the law as it exists today. Every right is preserved and will be enforced. The Declaratory Judgment only increases the court's power for good."). Delaware adopted the Uniform Declaratory Judgment Act virtually verbatim. *Compare* 10 *Del. C.* §§ 6501–13 *with* Unif. Declaratory Judgment Act §§ 1–17 (1922).

19

procedural means for securing judicial relief in an expeditious and comprehensive manner" before traditional justiciability principles might permit.[42]

When evaluating whether equitable jurisdiction exists in a declaratory judgment action, the question remains whether "there is any underlying basis for equity jurisdiction measured by traditional standards."[43] If the subject of the declaration is an equitable right, then the Court of Chancery has

---

[42] *See Hoechst Celanese v. Nat'l Union Fire Ins. Co.*, 623 A.2d 1133, 1136 (Del. Super. 1992). *See generally* 1 Edwin Borchard, *Declaratory Judgment*, ch. 2, at 23–26 (1934); Unif. Declaratory Judgment Act pmbl. (1922) ("[Traditional justiciability principle] has long been found too narrow to meet the requirements of modern social, industrial and economic conditions. Men ought not be forced to the necessity of encountering damage or assuming ruinous responsibilities before they are permitted to seek and secure a court decision as to their rights and duties."). If anything, the Declaratory Judgment Act is more equitable than legal: The concept of a declaratory judgment descends from the power of a court of equity to issue declarations and injunctions to prohibit threatened wrongs before they are committed. *See* Restatement (Second) of Judgments § 33 cmt. a (A.L.I. 1982); Borchard, *supra*, at 25–26 ("In these typical cases, no wrong or even hostile activity has been committed or threatened—a condition, it may be observed, which justified judicial relief in various equitable actions long before declaratory actions and judgments were *eo nomine* specifically authorized."); *see also* C.S. Potts, *Declaratory Judgment*, 9 Tex. L. Rev. 172, 175 (1931) (tracing the history of declaratory judgment in modern times to sixteenth century Scotland and then to the English Chancery Procedure Act of 1852).

[43] *Diebold*, 267 A.2d at 591.

jurisdiction.[44] So too if the General Assembly has granted subject matter jurisdiction to the Court of Chancery by statute.[45]

Jurisdiction also arises "if the petitioner can demonstrate a need for equitable relief to implement the remedy."[46] Here again, the litigant's "prayers [for relief] are not controlling and so the court must consider what plaintiff's complaint really seeks."[47] A permanent injunction against implementing the Data Policies would be a natural remedy to implement the declaratory judgment. Subject matter jurisdiction exists.

Next, the Claim Processors argue that an injunction to enforce a declaratory judgment cannot support equitable jurisdiction because "[d]eclaratory judgments are

---

[44] *Id.* ("Jurisdiction under the Declaratory Judgment Act is based on . . . whether the issues raised would be presented in a legal or equitable action if coercive relief were being sought."); *see Kraft*, 145 A.3d at 985 (collecting cases).

[45] *See, e.g.*, *Sciabacucchi v. Salzberg*, 2018 WL 6719718 (Del. Ch. Dec. 19, 2018) (entertaining declaratory judgment to consider whether charter provision complied with DGCL), *rev'd on other grounds*, 227 A.3d 102, 137–38 (Del. 2020); *Solak v. Sarowitz*, 153 A.3d 729, 733 (Del. Ch. 2016) (entertaining declaratory judgment over whether fee-shifting bylaw complied with DGCL).

[46] *250 Exec., LLC v. Christina Sch. Dist.*, 2022 WL 588078, at *6 (Del. Ch. Feb. 28, 2022); *see also Kraft*, 145 A.3d at 973–74, 979.

[47] *Highlights for Child., Inc. v. Crown*, 193 A.2d 205, 245 (Del. Ch. 1963); *see, e.g.*, *Kraft*, 145 A.3d at 985–86 (finding equity jurisdiction existed after determining the "fundamental essence of Kraft's declaratory judgment request" was "to cancel shares" despite the nature of the underlying declaratory judgment claim being legal and the prayed-for relief only being a declaratory judgment).

21

self-executing and have the force and effect of a final judgment or decree."[48] That is

partially right. The Declaratory Judgment Act provides that a declaration "shall have

the force and effect of a final judgment or decree."[49] But a declaratory judgment is

final only in the sense that it has issue- and claim-preclusive effect.[50] The declaratory

judgment is not self-executing, either in the sense of requiring a party to do something

or in the sense of invariably providing all the relief a party needs. An affirmative

declaratory judgment does not direct, require, or compel action; a negative

declaratory judgment does not prohibit or enjoin action. The declaratory judgment

interprets the obligation at issue. "Nevertheless, a party that fails to act in

conformance with a declaration exposes themselves to the possibility of coercive

---

[48] Opening Br. 18 (citing *Reed v. Brady*, 2002 WL 1402238, at *3 (Del. Ch. June 21, 2002) (footnote and internal quotation marks omitted), *aff'd*, 818 A.2d 150 (Del. 2003)).

[49] 10 *Del. C.* § 6501.

[50] Restatement (Second) of Judgments § 33 cmt. a (1934) ("*Preclusion as to matters declared*. If a declaratory judgment is valid and final, it is conclusive, with respect to the matters declared, as to all persons who are bound by the judgment."); *see also* Fed. R. Civ. Pro. 57 advisory committee's note to 1937 enactment ("The fact that a declaratory judgment may be granted 'whether or not further review is or could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary."); *Diebold*, 267 A.2d at 591 ("Obviously, the Declaratory Judgment Act does not fulfill the tests required for the ouster of equity jurisdiction. The element of express exclusiveness is lacking; and, as noted by the Chancery Court in the instant case, a declaratory judgment by the Superior Court might well require a return to Chancery for enforcement; thus, the element of equivalent remedy is also lacking. Any overlapping jurisdictions created by s 6501 are concurrent."). On the force and effect of a final judgment, *see generally* William Baude, *The Judgment Power*, 96 Geo. L.J. 1807, 1826–31 (2008).

relief."[51] That follow-on order enforces the declaratory judgment. The declaration itself is not self-executing in the sense that the Claim Processors suggest.[52]

As the next step in their argument, the Claim Processors note that parties are expected to obey the law, so unless there is reason to believe that a party would ignore the court's declaration, there is no need to supplement a declaratory judgment with an add-on injunction.[53] That doctrine originated in a case that sought an injunction against the Department of Transportation. The Secretary of Transportation

---

[51] *Zhou v. Deng*, 2022 WL 2803876, at *1 (Del. Ch. July 15, 2022) (ORDER); *250 Exec.*, 2022 WL 588078, at *6 ("[I]f it turns out that equitable relief is necessary, then mechanisms exist . . . [to] obtain equitable relief after the declaratory judgment has issued."); *Cantor Fitzgerald, L.P. v. Cantor*, 1999 WL 413394, at *3 (Del. Ch. June 15, 1999) ("A declaratory judgement [sic] declares the rights, status, or other legal relations of the parties to a lawsuit and is quite different both in its effect and requisite pleadings than a request for a permanent injunction." (footnote omitted)).

[52] The source of the "self-executing" language is a Superior Court case in which a party argued that a pending appeal suspended the effectiveness of a declaratory judgment. The court rejected that contention, stating: "[The declaratory judgment] is a self-executing decree which is not suspended by an appeal and the filing of a supersedeas bond." *Reese v. Hartnett*, 74 A.2d 68, 69 (Del. Super. 1950). A party could apply for and obtain a stay, but the order would not be stayed automatically. Later decisions have taken this quotation out of context, starting with *Reed*, 2002 WL 1402238, at *3, and cited the phrase as a statement about the need for further relief. *See, e.g.*, *Korn v. Wagner*, 2011 WL 4357244, at *1 (Del. Ch. Sept. 7, 2011). Two of those decisions are my own. *See 250 Exec.*, 2022 WL 588078, at *6 (quoting *Reed*); *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 470 (Del. Ch. 2018) (same). *Mea culpa.* The origins of the language and the implications of a declaratory judgment reveal that the phrase is now misused.

[53] *E.g.*, *250 Exec.,* 2022 WL 588078, at *6 ("Parties are expected to comply with final judgments. Consequently, unless there is reason to believe that a party will disregard the judgment, there is no need for an add-on in injunction."); *Organovo Hldgs., Inc. v. Dimitrov*, 162 A.3d 102, 114 n.52 (Del. Ch. 2017) (collecting cases).

submitted an affidavit representing that the department would comply with the court's decision. The court gave respect to a co-equal branch of government and accepted the representation.[54] The assumption of legal compliance continues to appear most frequently and have the most force in cases where parties seek injunctive relief against a government body.[55]

---

[54] *See Beaver Blacktop, Inc. v. Dep't of Transp.*, 1991 WL 101375, at *2 (Del. Ch. June 7, 1991) (Allen, C.).

[55] *Christiana Town Ctr., LLC v. New Castle Cnty.*, 2003 WL 21314499, at *4 n.19 (Del. Ch. June 6, 2003) ("It would be anathema to our form of government to believe, as a baseline principle, that after a court renders a declaratory judgment another governmental agency would not follow that decision. It may actually be the case that a particular agency does not follow such a judgment, but a party should only seek injunctive relief if that agency actually refuses to comply with the judicial declaration."); *see, e.g., Kroll*, 2023 WL 6012795, at *7 (same for City of Wilmington); *Citizens Against Solar Pollution v. Kent Cnty.*, 2023 WL 2199646, *2 (Del. Ch. Feb. 24, 2023) (same for county's contractor), *aff'd*, 2025 WL 751102 (Del. Mar. 10, 2025); *United Servs. Auto. Ass'n v. Lions Share Tr.*, 2023 WL 2145418, at *3 (Del. Ch. Feb. 21, 2023) (same for the secretary of state); *Delta Eta Corp. v. City of Newark*, 2023 WL 2982180, at *16–17 (Del. Ch. Feb. 2, 2023) (same for City of Newark); *Birney v. Del. Dep't of Safety & Homeland Sec.*, 2022 WL 16955159, at *2 (Del. Ch. Nov. 16, 2022) (same for state agency); *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1235 (Del. Ch. 2022) (same for governor); *Mock v. Div. of State Police, Dep't of Safety & Homeland Sec.*, 2022 WL 1744439, at *9 (Del. Ch. May 31, 2022) (same for state police); *Crown Castle Fiber LLC v. City of Wilm.*, 2021 WL 2838425, at *5–6 (Del. Ch. July 8, 2021) (same for City of Wilmington); *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at *53 (Del. Ch. May 24, 2017) (same for school districts); *Del. Bldg. & Constr. Trades Council, AFL-CIO v. Univ. of Del.*, 2014 WL 2218730, at *3 (Del. Ch. May 29, 2014) (same for the University of Delaware); *Gladney v. City of Wilm.*, 2011 WL 6016048, *4–5 (Del. Ch. Nov. 30, 2011) (same for City of Wilmington); *Reeder v. Del. Dep't of Ins.*, 2006 WL 510067, at *16 (Del. Ch. Feb. 24, 2006) (Strine, V.C.) (same for the Delaware Department of Insurance).

A more recent line of cases has extended the principle to escrow agents who have bound themselves contractually to comply with a court order addressing the escrowed funds. *See, e.g., Graciano v. Abode Healthcare, Inc.*, 2024 WL 960946, *9–

24

Even in these contexts, a plaintiff can ground jurisdiction on the need for equitable relief "[w]here there is a real chance that relief will not be forthcoming absent [an] injunction," "[w]here the right requires a remedy bespoke to the facts," or "[w]here an ongoing deprivation of rights needs a remedy."[56]

---

10 (Del. Ch. Mar. 4, 2024) (declining to assert equitable jurisdiction over a claim to release funds from escrow because the plaintiff did nothing to substantiate its fear that the agent might disobey a court ruling); *Elavon, Inc. v. Elec. Transaction Sys. Corp.*, 2022 WL 667075, at \*4 (Del. Ch. Mar. 7, 2022) (declining to assert equitable jurisdiction over a contract action where damages would be the primary form of relief based on the suggestion "that contingent relief, such as an escrow agent gone rogue, may necessitate an injunction."). Other decisions have declined to exercise equitable jurisdiction where it was not likely that a follow-on injunction would be needed. *See CTF Dev., Inc. v. BML Props. Ltd.*, 2022 WL 42041, \*4 (Del. Ch. Jan. 5, 2022) ("[T]he court will not exercise subject matter jurisdiction over breach of contract actions in which past breaches are remediable by monetary damages and future breaches are speculative."); *All. Compressors LLC v. Lennox Indus. Inc.*, 2020 WL 57897, at \*5 (Del. Ch. Jan. 6, 2020) (refusing to issue add-on injunction after finding future breach of contract "hypothetical" given the facts of the case); *Athene Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2019 WL 3451376, at \*8–9 (Del. Ch. July 31, 2019) (declining to exercise equitable jurisdiction over a quintessential contract action where the plaintiff did not show the company would disregard a court-declared contractual construction).

[56] *Birney*, 2022 WL 16955159, at \*2; *see Atl. Richfield Co. v. Tribbitt*, 1975 WL 1260, at \*2 (Del. Ch. May 30, 1975) ("Arguendo, if the statutes were invalid as to Atlantic because of some particular aspect of its business operations, but not unconstitutional *per se*, some order preventing enforcement as to Atlantic only would become necessary. Chancery can do this through injunction; the Superior Court cannot. I feel that this Court does have jurisdiction.").

This is a case where the court likely will have to use its equitable powers to craft a bespoke remedy, and a simple declaratory judgment cannot do the job.[57] As the Claim Processors have pointed out, it could well be inequitable to require them to maintain the Claims Data at their own expense, largely for the benefit of the Repeat Litigants. An injunction might need to be conditioned on the Repeat Litigants' agreement to pay the cost of retaining the Claims Data.[58] It also might involve

[57] *E.g.*, *Clark v. State Farm Mut. Auto. Ins. Co.*, 131 A.3d 806, 814–15 (Del. 2016) ("Any remedy would necessarily have to take the form of a detailed mandatory injunction, regulating the circumstances in which State Farm had to meet the thirty-day deadline and detailing those when it was permitted to proceed more deliberately so long as it paid the policyholder the statutorily required interest. A declaratory judgment is not a tool fitting to such an ambitious purpose." (footnote omitted)); *Delawareans for Educ. Opportunity v. Carney*, 2018 WL 4849935, at *8 (Del. Ch. Oct. 5, 2018) (exercising jurisdiction where tailored equitable relief was likely necessary; "A declaratory judgment that required immediate compliance could create a proverbial train wreck. An equitable decree can be tailored to the facts of the case. It can thus take into account proposals that the counties may make to solve the statutory problem (assuming the plaintiffs prove their case) and the time frame for implementation. This court also can adapt its decree to accommodate changed conditions. Through the exercise of its equitable jurisdiction, this court will be in a position to consider the facts and circumstances, balance the equities, and award carefully crafted relief." (footnote omitted)).

[58] *See* Samuel L. Bray, *Remedies, Meet Economics; Economics, Meet Remedies*, 38 J. L. Studies 71, 77 (2018) (discussing conditional injunctions); Douglas Laycock, *The Neglected Defense of Undue Hardship (and the Doctrinal Train Wreck in* Boomer v. Atlantic Cement*)*, 4 J. Tort L., no. 3, 2012, at 3–7 (same from doctrinal angle); G. Calabresi & A. Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1105–06 (1972) (same from law-and-economics angle). *See generally* JD Heydon, MJ Leeming, & PG Turner, *Meagher, Gummow & Lehane's Equity: Doctrines & Remedies* § 3-050 (5th ed. 2015) ("If the decree is to be final, equity may impose any condition on the plaintiff that will protect the legal or equitable rights of the defendant as the price of granting relief."); *see id.* §§ 3-050 to -065 (citing examples); Pomeroy § 393d n.7 ("In granting injunctive relief

conditions relating to data security and indemnification for data breaches. And it might be tailored to address different types of data. If the court determines that a remedy is warranted, these and other will have to be addressed. A declaration standing alone will not do the trick.

This court possess subject matter jurisdiction based on the initial need for preliminary injunctive relief. This court also possesses subject matter jurisdiction based on the Repeat Litigants' request for permanent injunctive relief.

## B. Subject Matter Jurisdiction Over A Bill Of Discovery

Subject matter jurisdiction exists because the complaint implicates a claim recognized in equity. As explored below, courts of equity in both England and America have long recognized that a petitioner can file a bill of discovery to obtain or preserve evidence for use in other proceedings, whether pending or anticipated. [59] "The jurisdiction of equity to grant discovery in actions at law is too well settled to be disputed." [60] When a petitioner seeks a bill of discovery, then subject matter

---

the court is not restrained by the strict legal rights of the parties but may impose such terms as are demanded by justice and regard for righteous conduct.").

[59] *See infra* Part IV. *See generally* 2 Joseph Story, *Commentaries on Equity Jurisprudence* §§ 1480–517 (Melville M. Bigelow ed., 13th ed. 1886) [hereinafter Story]; Pomeroy §§ 190–215; Geo. Tucker Bispham, *The Principles of Equity* § 35 (7th ed. 1905) (1874) [hereinafter Bispham]; George L. Clark, *Equity* § 420 (1919) hereinafter Clark].

[60] *Curran v. Craven*, 125 A.2d 375, 377 (Del. Ch. 1956) (Seitz, C.).

jurisdiction exists. The evidence ultimately may be insufficient to warrant issuing a decree, but the court has subject matter jurisdiction to consider the bill.

## III. STANDING

The Claim Processors next seek dismissal on the theory that the Repeat Litigants lack standing to sue. That argument fails as well.

Standing is an aspect of justiciability. Courts use standing and other justiciability doctrines like ripeness and mootness to assess whether the court should refrain from entertaining a claim that it otherwise would have subject matter jurisdiction to address.[61] When ruling on a justiciability issue, a court assumes that the underlying claim is valid and asks whether the court should still decline to hear it.[62]

"The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance."[63] Standing is concerned "only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[64]

---

[61] *See Gandhi-Kapoor*, 307 A.3d at 341–42.

[62] *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 991 (Del. Ch. 2024).

[63] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[64] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991).

The standing inquiry under Delaware law differs from the standing inquiry under federal law. "Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[65] Justiciability doctrines technically do not limit state courts, because state courts draw their jurisdiction from the original sovereignty of the several states as governments with plenary and unenumerated powers.[66] Standing in the state courts is predominantly discretionary and prudential.[67]

## A.    Standing By Analogy To Federal Law

The principles for analyzing standing under federal law provide a starting point for "for determining standing to bring a case or controversy within the courts of Delaware."[68] Under the federal standard, a plaintiff must establish (i) an injury to a legally protected interest and (ii) demonstrate that the interest they seek to vindicate

---

[65] *Dover Hist. Soc'y*, 838 A.2d at 1111 (quoting *Stuart Kingston*, 596 A.2d at 1382); *Gandhi-Kapoor*, 307 A.3d at 341.

[66] *Gandhi-Kapoor*, 307 A.3d at 341; *see generally* John Dimanno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 Conn. L. Rev. 639, 658–63 (2008) (collecting authorities); Randy J. Holland, *State Constitutions: Purpose and Function, in* The Delaware Constitution of 1897: The First One Hundred Years 3, 13–14, 16 (Randy J. Holland & Harvey Bernard Rubenstein eds., 1997).

[67] *In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 510 (Del. Ch. 2020); S*tuart Kingston*, 596 A.2d at 1382 ("[S]tate courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'").

[68] *See Dover Hist. Soc'y*, 838 A.2d at 1110–11.

is "arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question."[69]

The injury element is itself multi-faceted:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
>
> (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and
>
> (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[70]

The Delaware courts apply this test flexibly and with sensitivity to policy considerations.[71] In this case, standing exists under the federal framework.

### 1. Injury In Fact

The first issue for the federal standing analysis is whether the Repeat Litigants have identified a threatened injury in fact, framed as an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or

---

[69] *Gannett Co. v. State*, 565 A.2d 895, 897 (Del. 1989).

[70] *Dover Hist. Soc'y*, 838 A.2d at 1110 (formatting altered and internal quotation marks omitted); *accord Oceanport Indus., Inc. v. Wilm. Stevedores*, Inc., 636 A.2d 892, 904 (Del. 1994).

[71] *See, e.g.*, *In re Orchard Enters., Inc. S'holder Litig.*, 2014 WL 4181912, at *12 (Del. Ch. Aug. 22, 2014); *In re Aristotle Corp.*, 2012 WL 70654, at *2 (Del. Ch. Jan. 10, 2012) (Strine, C.); *Andra v. Blount*, 772 A.2d 183, 189–90 (Del. Ch. 2000) (Strine, V.C.).

imminent, not conjectural or hypothetical. The complaint satisfies those requirements.

The complaint adequately pleads that the Repeat Litigants are constantly embroiled in asbestos litigation. The complaint adequately pleads that the Repeat Litigants regularly seek Claims Data from the Claim Processors so they can defend against asbestos claims. The complaint adequately pleads that if the Claim Processors implement the Data Policies, then the bulk of the Claims Data will be destroyed, and the Repeat Litigants will no longer have access to it. As a result, they will be unable to defend cases effectively. They will face greater liability and settle more cases for higher amounts than if the information remained available. That injury is sufficiently concrete, particularized, actual, and imminent.

The Claim Processors argue that the alleged injury is "entirely hypothetical and conjectural,"[72] but it is difficult to understand how those adjectives could be apt. The Claim Processors have stated that they will implement the Data Policies, and the implementation will have the identified effects.

By contrast, the Claim Processors have a legitimate argument over whether the destruction of the Claims Data invades a legally protected interest. A third party generally does not have any ability to specify what information another party must retain or on what terms. An obligation to retain information might exist under a

---

[72] Opening Br. 22 (internal quotation marks omitted).

statute or regulation, or under a contract, but otherwise it arises only when a party anticipates litigation.

The receipt of a subpoena triggers a duty to preserve relevant information.[73] Here, the complaint sufficiently alleges that asbestos litigation is effectively omnipresent and that the Repeat Litigants consistently subpoena the Claims Processors for information. It is reasonably conceivable that the Claims Processors have an ongoing obligation to retain the Claims Data because they must reasonably anticipate litigation in which the Claims Data will be sought.

---

[73] *In re Stillwater Asset Backed Offshore Fund Ltd.*, 2017 WL 1956848 (Bankr. S.D.N.Y. May 10, 2017) ("The formal service of the court-authorized discovery subpoenas plainly imposed upon Rohan an affirmative obligation to preserve and to produce the subpoenaed materials."); *United States v. Grant*, 2008 WL 678553, at *2 (S.D.N.Y. Mar. 11, 2008) ("[W]e remind Ms. Watkins that, having been served with a subpoena, she is required by law to preserve all documents arguably responsive to the subpoena."); *Ervine v. S.B.*, 2011 WL 867336, at *2 (N.D. Ill. Mar. 10, 2011) ("The subpoenaed third parties additionally are to preserve any and all responsive information sought by the subpoena based on the common law duty to preserve evidence once 'the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001)). *See generally* 4 Bus. & Com. Litig. Fed. Cts. *Rule 45: Nonparty discovery* § 33:23, Westlaw (5th ed., database updated Nov. 2024) ("Rule 45 can be used by a party to seek discovery of relevant ESI in the possession of a nonparty. The Rule, in effect, requires both the party seeking discovery and the responding party to address and weigh various factors. . . . The third party weighs its obligation to preserve potentially relevant information and a possible motion to compel production against the burdens of preservation, collection, review, and production, including other factors such as confidentiality and personal privacy issues. . . . Although nonparties typically do not have a duty to preserve ESI based on foreseeability of litigation, a Rule 45 subpoena may serve as a preservation trigger.").

The Claim Processors also have a reasonably conceivable interest in the information as trust beneficiaries. A trust beneficiary is "[a] person for whose benefit property is held in trust."[74] The trust agreements governing the settlement trusts anticipate that asbestos defendants like the Repeat Litigants will pay amounts to Direct Claims, then seek contribution or indemnification from the settlement trusts. The trust agreements identify the claimants seeking contribution and indemnification as Indirect Claimants and make them trust beneficiaries. The trust agreements require that the trusts be managed so that holders of both Direct and Indirect Claims are treated "fairly, equitably and reasonably in light of the limited assets available to satisfy such claims." [75] As Indirect Claimants and trust beneficiaries, the Repeat Litigants have an interest in the Claims Data so they can pursue their contribution claims. The complaint adequately pleads that by implementing the Data Policies and destroying the Claims Data, the trustees are inequitably favoring Direct Claimants over Indirect Claimants, in violation of their duties to all claimants. The complaint therefore pleads that the destruction the Claims Data invades a legally protected interest belonging to the Repeat Litigants.

---

[74] Restatement (Third) of Trusts § 3 (A.L.I. 2003).

[75] *See, e.g.*, Answering Ex. A § 1.2 [hereinafter Owens Corning Trust Agreement] (requiring all Personal Injury Trust Claims as defined in the Chapter 11 plan to be treated alike); Owens Corning Plan §§ 1.25, 1.140, 1.202 (defining "Asbestos Personal Injury Claim" to include "Indirect Asbestos PI Trust Claim").

The Claim Processors argue that even if the Repeat Litigants could be Indirect Claimants, the Repeat Litigants have not alleged specific indirect claims for which they currently seek Claims Data. It is reasonably conceivable that given the nature of asbestos litigation, the Repeat Litigants presently enjoy the status of Indirect Claimants. Moreover, the existence of a present claim is not required. The trust agreements define Indirect Claims to include "present or future" rights to payment, "whether or not the facts of or legal basis . . . are known or unknown," whether asserted by any person "who has been, is or maybe a defendant" in an asbestos lawsuit, and whether the liability is for "reimbursement, contribution, subrogation or indemnification of any portion of any damages such Person has paid or may pay to the plaintiff in such action."[76] The Repeat Litigants possess Indirect Claims under that definition and qualify as Indirect Claimants. Under these provisions, the Repeat Litigants are trust beneficiaries and have a legally protected interest in the Claims Data.

The Claim Processors also argue that the Repeat Litigants have not identified specific Claims Data that needs to be preserved. The Repeat Litigants do not know what specific Claims Data they need or when specific asbestos plaintiffs will sue, but they know that many asbestos plaintiffs will sue and that they will need Claims Data to defend those cases. By analogy, meteorologists cannot foresee where it will rain

---

[76] *See, e.g.*, Owens Corning Plan §§ 1.142, 1.140, 3.4(d)(ii) (channeling all direct and indirect claims exclusively to the asbestos trust); *see also* Answering Br. 22 n.14 (citing trust governing documents for other Claim Processors) .

next month. They still know that at any one time, there are approximately 1,800 rainstorms happening across the globe, and they can say that rainstorms happen more often in some areas (tropical and temperate zones) than others (arid and cold zones). The Repeat Litigants are in a similar position; they know they need rain gear. The Claim Processors are like competing meteorologists who claim no one should buy raingear unless they can show it is raining where they are right now.

The Repeat Litigants have met the injury-in-fact requirement that would apply under federal law.

## 2. Causation

The second issue for the federal standing analysis is causation. The injury must be sufficiently traceable to the defendant and not the result of independent action by a third party.

This issue is easy. The threat of injury exists because the Claim Processors have adopted the Data Policies and plan to implement them. Doing so would result in the destruction of the vast majority of the Claims Data. There is a direct line from the Claim Processors' action to the injury the Repeat Litigants face.

The Claim Processors argue the implementation of the Data Policies and the destruction of the Claims Data cannot cause any injury because the Repeat Litigants can easily obtain relevant Claims Data from the asbestos plaintiffs themselves. As described in the Factual Background, the complaint's factual allegations support a quite different inference. The complaint explains why asbestos plaintiffs cannot and do not provide meaningful information about exposures to other asbestos-related

35

products or the relative severity of those exposures. The complaint's allegations support an inference that the Claims Data is a unique resource and that the implementation of the Data Policies will cause specific and direct harm to the Repeat Litigants.

### 3. Redressability

The last issue for the federal standing analysis is redressability. The court must evaluate whether a favorable decision will address the threatened injury.

This issue is also easy. If the court finds that the Claim Processors must preserve the Claims Data and enjoins them from implementing the Data Policies, the Repeat Litigants will no longer face the threat of injury that animates this lawsuit. Redressability is satisfied.

## B. Standing In Equity

To reiterate, the different jurisdictional reach of state courts and the plenary authority of state sovereigns means that federal standing law does not strictly limit the ability of a state court to hear a case. Where traditional principles of equity recognize that a particular party can bring a claim, standing to bring that claim exists, independent of the federal test.

As explored below, a petitioner can file a bill of discovery in a court of equity to obtain and preserve evidence for use in other proceedings, whether pending or

anticipated.[77] If the petitioner can plead the requirements for a bill of equity, then the petitioner can proceed. Standing exists if the petitioner can state a claim on which relief could be granted. Here, the Repeat Litigants can state a claim for a bill of discovery. Standing in equity therefore exists.

## IV. RULE 12(B)(6)

Last, the Claim Processors have moved to dismiss the complaint under Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[78] Here, the complaint states reasonably conceivable claims. That does not mean the court will grant the relief sought. It simply means that the case can move past the pleading stage.

The Repeat Litigants' claim bears a close filial resemblance to a longstanding—although now somewhat forgotten—claim in equity. Through a bill of discovery, a court of equity could deploy its equitable powers to assist the petitioner in obtaining

---

[77] *See infra* Part IV. *See generally* Story §§ 1480–517; Pomeroy §§ 190–215; Bispham § 35; Clark § 420.

[78] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

evidence for use in another pending or anticipated proceeding.[79] The bill served to "facilitate proof, . . . i.e., to make proof easier"[80] and to "assist and promote the administration of public justice in other courts."[81] Although rarely used after the adoption of modern rules of civil procedure, "a majority of courts which have addressed the issue have recognized the continued existence of the independent action for discovery known as the equitable bill of discovery, to authorize discovery outside of the rules in limited situations for use in a pending action or an action about to be brought."[82]

To plead a claim for a bill of discovery, a petitioner must demonstrate an interest in a pending or anticipated case, articulate how the evidence sought is material to the case, and show that the evidence cannot be obtained effectively, conveniently, or completely through other means, such as through discovery in principal case.[83] The last element represents an issue-specific application of the

---

[79] *See generally* Story §§ 1480–517; Pomeroy §§ 190–215; Bispham § 35; Clark § 420.

[80] *See Goldberg v. Reg'l Sch. Dist. #18*, 2014 WL 7662507, at *3–4 (Conn. Super. Ct. Dec. 17, 2014) (citation omitted).

[81] Story § 1488.

[82] Rupert F. Barron, *Existence and Nature of Cause of Action for Equitable Bill of Discovery*, 37 A.L.R. 5th 645 (1996).

[83] *See, e.g.*, Story §§ 1490, 1493, 1497, 1508, 1511; Pomeroy §§ 197, 197a, 198; *accord Goldberg*, 2014 WL 7662507, at *3–4 (stating equitable bill of discovery is intended to make proof easier and is "only precluded if the alternate remedy is specific, effective, convenient and complete").

general principle that equity will not intervene when an adequate remedy exists at law. If the petitioner can obtain the evidence in the principal case, then the petitioner has an adequate remedy at law.

The "equitable bill of discovery afforded the primary means of discovery in civil litigation prior to the adoption of the Federal Rules of Civil Procedure and state rules and statutes based thereon."[84] Its origins lay in "old, rigid common-law rules under which an adverse party could not be compelled to produce documents for use in litigation."[85] In response, "equity courts created the bill of discovery as an exercise of auxiliary jurisdiction to compel discovery in aid of actions at law."[86]

The complaint states a claim under that venerable doctrine.

## A. The Complaint Pleads The Elements For A Bill Of Discovery

To reiterate, a petitioner seeking to plead a claim for a bill of discovery must demonstrate an interest in a pending or anticipated case, articulate how the evidence sought is material to the case, and show that the evidence cannot be obtained effectively, conveniently, or completely through other means, such as through discovery in the principal case. The complaint pleads facts that establish each element for purposes of pleading-stage analysis.

---

[84] Barron, *supra*, § 2 (citing Pomeroy § 193).

[85] *Id.*

[86] *Id.*

### 1.    The Existence Of Pending Or Anticipated Actions

The Repeat Litigants first must plead facts supporting their interest in a pending or anticipated case. The Repeat Litigants have more than satisfied this requirement.

The Repeat Litigants have credibly alleged that they are routinely named as defendants in asbestos litigation. Many asbestos actions against the Repeat Litigants are pending. Asbestos plaintiffs constantly file more actions against the Repeat Litigants. They have a right to defend those cases.

The Repeat Litigants have also shown that they routinely submit claims for contribution to the Claim Processors. As Indirect Claimants, the Repeat Litigants have a right to pursue those claims. Although the channeling injunctions force those claims out of the court system and onto the alternative dispute resolution track established by each settlement trust, that does not change the fact that the Repeat Litigants have a legal right that they can pursue.

The Claim Processors respond by contending that a bill of discovery is only available to provide discovery for a pending case. That misstates the law. While many bills of discovery did relate to an already pending action, that was never a requirement.[87] As Pomeroy observes, "The action in aid of which the discovery is sought may be pending; but this is not necessary. It is sufficient if the plaintiff in the bill for a discovery shows that he has a right to maintain or defend an action in

---

[87] Story § 1483; Pomeroy § 197b.

another court,"[88] which may be "pending or anticipated."[89] Justice Story states the rule similarly: "[N]either does it constitute any objection to a bill of discovery that the suit, which it is to aid, has not yet been commenced; for it may be indispensable to enable the party rightly to frame his action and declaration."[90]

That said, equity will not countenance an unjustified fishing expedition. According to Pomeroy, the petitioner must show that he "has a right to maintain or defend an action in another court, and that he is about to sue or is liable to be sued therein, although no action is yet commenced."[91] A "real cause of action" must be "pending or imminent."[92]

The Repeat Litigants have satisfied the imminence requirement. The complaint supports an inference that they face an ongoing barrage of asbestos claims for which they seek discovery from the Claim Processors. As they regularly settle claims or get adverse judgments, they seek contribution from the Claim Processors. The close connection to an imminent action exists.

---

[88] Pomeroy § 197b.

[89] *Id.* § 198.

[90] Story § 1495.

[91] Pomeroy § 197b.

[92] *Id.*

41

## 2. The Materiality Of The Evidence

The Repeat Litigants next must plead facts supporting a reasonably conceivable inference that the evidence sought is material to the case. No one meaningfully disputes this element.

The complaint supports a reasonable inference that the Claims Data is the key to defending asbestos lawsuits. Were that not enough, at least fifteen states have enacted Trust Transparency Statutes[93] to make clear that Claims Data is relevant and admissible in asbestos lawsuits.[94] The courts that manage significant asbestos dockets have entered case management orders that allow solvent defendants to seek Claims Data.[95]

The *Garlock* decision points to the same outcome. In a liability estimation proceeding, the bankruptcy court found that an insolvent asbestos defendant seeking to establish a settlement trust had been unable to obtain Claims Data consistently when settling cases. The court held that the absence of Claims Data rendered the

---

[93] Ala. Code §§ 6-5-690 to -694 (2019); Ariz. Rev. Stat. § 12-782 (2018); Iowa Code §§ 686a.1–.9 (2018); Kan. Stat. Ann. §§ 60-4912 to -4918 (2018); Mich. Code Ann. § 600.3010–.3016 (2018); Miss. Code §§ 11-67-1 to -15 (2018); N.D. Cent. Code §§ 32-46.1-01 to -05 (2018); Ohio Rev. Code Ann. §§ 2307.951–.954 (West 2018); Okla. Stat. tit. 76, §§ 81–89 (2018); S.D. Codified Laws §§ 21-66-1 to -11 (2018); Tenn. Code §§ 29-34-601 to -609 (2018); Tex. Civ. Prac. & Rem. Code Ann. §§ 90.051–.058 (West 2018); Utah Code §§ 78b-6-2001 to -2010 (2018); W. Va. Code §§ 55-7f-1 to -11 (2018); Wis. Stat. § 802.025 (2018); *see also* N.C. Sess. L. 2018-4 (codified in rules of evidence and civil procedure).

[94] *See* Compl. ¶¶ 56–57.

[95] *Id.* ¶ 55 & nn.9–10.

debtor's history of asbestos litigation settlements sufficiently unreliable that it could not be used as a source to estimate the debtor's total asbestos liability.[96] Instead, the court relied on an estimate ten time lower that included "job histories [and] asbestos exposure information relating to [the debtor]'s and third-parties' products."[97] That is the type of information the Claims Data contains.

### 3. The Inability To Obtain The Evidence From Other Sources

The Repeat Litigants finally must plead facts supporting a reasonably conceivable inference that the evidence cannot be obtained effectively, conveniently, or completely through other means, such as through discovery in the principal cases. This element represents an issue-specific application of the general principle that equity will not act when an adequate remedy exists at law. Consistent with that rule, a court of equity will not entertain a bill of discovery if the court presiding over the principal case (or which will preside over the anticipated case) is "itself competent to grant the same relief."[98]

Here, the problem is not that the court presiding over an asbestos liability proceeding cannot issue subpoenas to the Claim Processors (or authorize their issuance). The problem is that if the Claim Processors implement the Data Policies,

---

[96] *See Garlock*, 504 B.R. at 94–95 ("[T]he settlement history data does not accurately reflect fair settlements because exposure evidence was withheld.").

[97] *See id.* at 74, 95.

[98] Story § 1495.

then all but the most recent one year's worth of Claims Data for resolved claims will be destroyed. At that point, no court will be able to obtain the evidence from the Claim Processors. By definition, it will be impossible to obtain the evidence.

The complaint pleads facts supporting a reasonable inference that the Repeat Litigants cannot obtain comparable information from other sources. They cannot obtain it as effectively, conveniently, or completely as from the Claims Processors.

The Claim Processors primarily argue that the asbestos plaintiffs could provide the information. As discussed in the Factual Background, the complaint pleads facts supporting the inference that asbestos plaintiffs rarely will be able to provide the necessary information because (1) the nature of asbestos injuries creates inherent uncertainty about when exposures may have occurred, their severity, and which products were involved, (2) long latency periods mean that memories fade, and (3) asbestos personal injury lawyers typically refresh their clients' recollections only about exposures involving the named defendants, so the injured claimants lack information about other exposures.

Under these circumstances, establishing alterative exposures requires data establishing patterns involving particular industries, job sites, time periods, and manufacturers. For solvent tort system defendants like the Repeat Litigants, the Claims Data constitute the only realistic source of meaningful information that can be used for that purpose

**B.     The Claim Processors' Challenges To The Bill Of Discovery**

Having pled all three requirements, the Repeat Litigants have stated a claim for a bill of discovery. The Claim Processors, however, advance other objections. All fail.

**1.     The Contention That The Bill Of Discovery No Longer Exists**

The Claim Processors start by questioning whether the Court of Chancery still possesses the power to issue a bill of discovery. They contend that modern discovery has rendered the bill of discovery obsolete.[99] That is incorrect.

A majority of courts have held that the bill of discovery survives absent an express prohibition.[100] Delaware has not enacted an express prohibition, which would require a constitutional amendment.

The Delaware Constitution of 1897 establishes this court's jurisdiction.[101] Under that document, the Court of Chancery's equity jurisdiction encompasses "all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies."[102] At the time of the separation, the English Court of Chancery had been entertaining bills of discovery since before the

---

[99] Defs.' Suppl. Br. 3–7.

[100] Barron, *supra,* § 2.

[101] Del. Const. art. IV, § 10.

[102] *DuPont v. DuPont*, 85 A.2d 724, 727 (Del. 1951).

reign of Elizabeth I.[103] That power crossed the Atlantic and was constitutionally vested in the Delaware Court of Chancery.

The General Assembly can only limit the Court of Chancery's jurisdiction by statute if the legislature substitutes a legal remedy that "is both adequate and exclusive."[104] Absent constitutionally sufficient legislative action, "Chancery jurisdiction remains, notwithstanding . . . a remedy elsewhere that may be adequate, unless the new remedy is equivalent and is expressly made exclusive."[105] "[T]he historical equitable jurisdiction of the Court of Chancery to hear a matter cannot be divested simply by the legislative enactment of a new statute addressing the same subject matter."[106]

Here, the General Assembly has never enacted legislation attempting to limit the Court of Chancery's power to issue a bill of discovery. The Court of Chancery has adopted rules modeled on the Federal Rules of Civil Procedure, and those rules contemplate broad discovery. So have the other Delaware trial courts. Those rules create an adequate remedy at law in most circumstances that obviates the need for a

---

[103] Pomeroy § 192.

[104] *Douglas v. Thrasher*, 489 A.2d 422, 426 (Del. 1985) (citing *DuPont*, 85 A.2d at 729–30).

[105] *Diebold*, 267 A.2d at 591.

[106] *In re Arzuaga-Guevara*, 794 A.2d 579, 585 (Del. 2001).

bill of discovery, but they do not eliminate the court's jurisdiction to issue a bill of discovery when warranted.[107]

Events at the federal level confirm that the adoption of modern procedural rules that address discovery does not foreclose the traditional power of equity to grant a bill of discovery. In 1970, the Supreme Court of the United States amended Federal Rule of Civil Procedure 34 to "make clear that the rule does not preclude an independent action for analogous discovery against persons not parties,"[108] thereby addressing some practitioners' concern that the rules had preempted the traditional bill.[109] In 1991, after the justices promulgated Rule 45 to authorize subpoenas to third parties, the Advisory Committee added an additional note to Rule 34 to confirm that the adoption of Rule 45 and corresponding changes to Rule 34 were "not intended to

---

[107] The Claim Processors also observes that Delaware does not statutorily permit pre-suit discovery. Defs.' Suppl. Br. 14–15. The absence of a statutory mechanism eliminates the need to analyze whether the General Assembly sought to make the mechanism exclusive and whether it is constitutionally adequate. The fact that no statutory mechanism exists supports—rather than undermines—the continuing vitality of the bill of discovery under circumstances where an adequate remedy at law does not exist.

[108] Fed. R. Civ. P. 34 advisory committee's note to 1970 amendment.

[109] *Id.* ("Comments from the bar make clear that in the preparation of cases for trial it is occasionally necessary to enter land or inspect large tangible things in the possession of a person not a party, and that some courts have dismissed independent actions in the nature of bills in equity for such discovery on the ground that Rule 34 is preemptive. While an ideal solution to this problem is to provide for discovery against persons not parties in Rule 34, both the jurisdictional and procedural problems are very complex. For the present, this subdivision makes clear that Rule 34 does not preclude independent actions for discovery against persons not parties.").

preclude an independent action for production of documents or things or for permission to enter upon land, but such actions may no longer be necessary in light of this revision."[110]

The Claim Processors cite two Delaware cases to argue modern discovery devices have rendered traditional bills of discovery unnecessary in most circumstances, but that is not controversial. In 1935, thirteen years before the Delaware courts adopted modern procedural rules, the Superior Court observed that

> [i]t is unnecessary for [the Superior Court] to consider the limitations existing at common law respecting the production of documents nor to trace the development of equitable Bills of Discovery, nor the statutory equivalents therefor. It is sufficient that the Delaware statute expressly grants to this Court that plenary power theretofore exclusively exercised by the Court of Chancery as to the production of documents.[111]

The statute in question—since repealed and folded into the Superior Court rules—gave the Superior Court the power to order the discovery being sought, so a bill of discovery was not warranted.[112] The statute granted authority to the Superior Court; it did not limit equity's jurisdiction.

---

[110] Fed. R. Civ. P. 34 advisory committee's note to 1991 amendment. Federal courts have allowed bills of discovery after the addition of Rule 45. Barron, *supra*, § 20. In some cases, federal courts have denied bills of discovery because Rule 45 is adequate. *Id.* § 19. That does not mean jurisdiction to issue a bill of discovery in appropriate circumstances no longer exists.

[111] *Wise v. Western Union Telegraph Co.*, 178 A. 640, 641 (Del. Super. 1935).

[112] *Del. C.* 1915, § 4228 ("At any time during the pendency of actions at law, the [Superior] Court, on motion and due notice thereof, may order a party to produce books, or writings, in his possession, or control, which contain evidence pertinent to the issue, under circumstances in which the production of the same might be

In 1956, eight years after the adoption of modern procedural rules, this court issued what was previously the most recent Delaware decision to address a bill of discovery.[113] The court dismissed the bill because the Superior Court could subpoena the record being sought.[114] The case did not hold that bills of discovery were no longer available; it held that a party cannot obtain a bill of discovery where an adequate remedy exists at law.[115]

The bill of discovery remains viable and potentially available. The question is whether its requirements have been met. For the reasons already discussed, the complaint's allegations satisfy those requirements at the pleading stage.

### 2. The Contention That The Courts Must Be In The Same Jurisdiction

Next, the Claim Processors suggest that a court should only grant a bill of discovery if in the same jurisdiction as the court presiding or expected to preside over

---

compelled by a Court of Chancery; and the Court making such order, shall have the same power for enforcing it which is exercised by a Court of Chancery in like cases.").

[113] *Curran*, 125 A.2d 375.

[114] *Id.* at 377 ("[T]he report is nothing more nor less than the written opinion of the State Psychiatrist who along with his records is subject to the subpoena power of the Superior Court.").

[115] *Id.* ("The jurisdiction of equity to grant discovery in actions at law is too well settled to be disputed.").

the principal case.[116] There does not appear to be any credible support for the same-jurisdiction argument.

To advance the same-jurisdiction argument, the Claim Processors rely on an annotation collecting cases on bills of discovery, which states: "At least two modern courts have held that, where a party seeks a bill of discovery in aid of another proceeding, the court which has jurisdiction over the main proceeding has exclusive jurisdiction to grant the bill."[117] That sentence does not posit that the court granting the bill of discovery must be in the same jurisdiction as the court hearing the underlying case. It asserts that the court hearing the principal proceeding must permit the bill of discovery to proceed. Neither of the referenced cases—both Texas appellate decisions applying a Texas procedural rule[118]—held that the court granting

---

[116] *See* Defs.' Suppl. Br. 5 ("Some such courts also allow it only . . . in the same jurisdiction where the underlying action is brought . . . ."). They suggest that the Repeat Litigants should pursue bills of discovery in courts around the world, arguing that "[i]f there were litigation, it likely would occur in a different jurisdiction, given that the individuals at issue reside in all 50 states and abroad." *Id.* at 7.

[117] Barron, *supra*, § 10.

[118] At the time, in 1957, the Texas rule stated: "All trial courts shall entertain suits in the nature of bills of discovery, and grant relief therein in accordance with the usages of courts of equity. Such remedy shall be cumulative of all other remedies. In actions of such nature, the plaintiff shall have the right to have the defendant examined on oral interrogatories, either by summoning him to appear for examination before the trial court as in ordinary trials, or by taking his oral deposition in accordance with the general rules relating thereto." Tex. R. Civ. P. 737 (repealed).

the bill of discovery must be in the same jurisdiction as the court presiding over the principal case.[119]

In fact, the rule cited in the annotation appears to be mistaken dictum from the latter of the two Texas cases. In *Moody*, the first case, a party to a will contest in probate court filed a bill of discovery in a Texas district court. The trial court held that the probate court could grant the same discovery, eliminating the need for the bill, and the Texas appellate court affirmed.[120] *Moody* did not hold that the probate court had to approve the bill of discovery.

*Ramirez* involved a similar scenario. A party to a divorce proceeding in Mexico sought a bill of discovery in Texas. The trial court denied the bill, finding that the party "did not prove that the Mexican courts cannot grant a similar discovery request," and the Texas appellate court affirmed.[121] But when describing the applicable law, the court cited *Moody* for the proposition that "[i]f a party seeks discovery to aid another proceeding, the court having jurisdiction over the main

---

[119] *See Ramirez v. Lagunes*, 794 S.W.2d 501, 505 (Tex. App. 1990); *Moody v. Moody Nat. Bank of Galveston*, 302 S.W.2d 695, 697–98 (Tex. Civ. App. 1957).

[120] *Moody*, 302 S.W.2d at 697 ("The conclusion is inescapable that within its jurisdiction over probate matters including will contests the probate court has as much power, express and implied, to grant the relief sought [under Tex. R. Civ. P. 737] as does a district court in matters over which it has original jurisdiction, and that the appellant could secure from the probate court all of the relief which he seeks in this proceeding.").

[121] *Ramirez*, 794 S.W.2d at 506.

proceeding has exclusive jurisdiction to grant discovery relief."[122] That statement

mischaracterized *Moody*, which neither asserted that proposition nor reached a

holding that supported it. The statement also makes little sense for a bill of discovery,

which a court of equity can grant when no other action is pending and thus when no

principal court exists that could serve as a discovery gatekeeper.[123]

The Claim Processors also rely on language from a decision from the Supreme

Court of the United States that quoted Justice Story for the following proposition:

"[C]ourts of equity will not entertain a bill for discovery to assist a suit in another

court, if the latter is, of itself, competent to grant the same relief; for in such a case

the proper exercise of the jurisdiction should be left to the functionaries of the court

where the suit is pending."[124] That sentence likewise says nothing about the two

courts being in the same jurisdiction. It discusses the same issue on which the Texas

decisions turned: A court of equity only will grant a bill of discovery where the

---

[122] *Id.*

[123] A court that has been asked to issue a bill of discovery likely would take guidance from a court presiding over the principal dispute as to the legitimate scope of discovery, just as a court does when asked to exercise its jurisdiction to assist a sister court by issuing or enforcing a subpoena. *See generally* H.D.W, *Practice or Procedure for Testing Validity or Scope of the Command of Subpoena Duces Tecum*, 130 A.L.R. 327 (1941 & Supp.). But the principal court does not have "exclusive jurisdiction" over discovery, as *Ramirez* posits, and *Moody* does not support that assertion.

[124] *Ex parte Boyd*, 105 U.S. 647, 657 (1881) (quoting Story § 1495 (alteration in original)); *see* Defs.' Suppl. Br. 6 n.18 (quoting same).

petitioner lacks an adequate remedy at law, and if the court presiding over the principal litigation can grant the discovery, then an adequate remedy exists at law.

The same-jurisdiction rule is not a thing. It does not warrant dismissal.

### 3. The Contention That The Subject Of The Order Must Be A Party To A Pending Case

Next, the Claim Processors contend that a bill of discovery can be used only to obtain discovery from a person who is or will be a party to the principal litigation. That is not correct.

Historically, bills of discovery were usually directed at an adversary in a pending or contemplated suit. That was because of the inflexible rule at common law that parties to an action were "incompetent as witnesses and no means were provided by which an adverse party could be compelled to produce documents in his or her possession for the use of his opponent at the trial."[125] But to claim that the bill of discovery could be directed only to parties treats the most frequent use as if it were the only use. Although bills of discovery directed to non-parties were and remain less common, courts have granted them.[126]

---

[125] 27 C.J.S. *Discovery* § 8, Westlaw (database updated May 2025).

[126] Barron, *supra*, § 6[c]; *see Invs. Mortg. Ins. Co. v. Dykema*, 598 F. Supp. 666, 668–69 (D. Or. 1984) (granting bill of discovery against non-party); *Shorey v. Lincoln Pulp. & Paper Co., Inc.*, 511 A.2d 1076, 1077 (Me. 1986) (holding that the court can grant bills of equity against non-parties); *Stokes v. 835 N. Wash. St., LLC*, 784 A.2d 1142, 1147 (Md. Ct. Spec. App. 2001) ("We therefore hold that the circuit courts have the power to order inspection of a non-party's property on a case-by-case basis through the equitable bill of discovery."); *Temple v. Chevron U.S.A., Inc.*, 840 P.2d 561, 564 (Mont. 1992) (explaining that "nothing in Rule 34(c)" precludes ""an

In any event, a non-party rule would not mandate dismissal here, because the Claims Processors are not third parties who have no interest in an asbestos plaintiff's action against the Repeat Litigants. The Claims Processors' pre-bankruptcy predecessors would have been co-defendants but for their reorganizations and the channeling injunctions. The Claim Processors still have an obligation to process the Repeat Litigants' Indirect Claims for contribution and indemnification.

At a later stage of the case, the court might well not order relief against the Claim Processors. But the Claim Processors cannot rely on their status as third parties to the underlying asbestos litigation to obtain dismissal as a matter of law.

### 4. The Contention That A Bill Of Discovery Will Not Support A Preservation Order

Next, the Claim Processors argue that a bill of discovery cannot support an injunction directing them to preserve the Claims Data, rather than an order

---

independent action against a non-party" when "the discovery is necessary, is not otherwise obtainable, and serves the interest of justice"); *Lefebvre v. Somersworth Shoe Co.*, 41 A.2d 924, 927 (N.H. 1945) (holding that the court can grant bill of equity against non-parties); *Davila v. Cont'l Can Co.*, 500 A.2d 721, 722–23 (N.J. Super. Ct. App. Div. 1985) (granting bill of discovery against a non-party); *Beckwith vs. Bethlehem Steel Corp.*, 440 A.2d 1372, 1375 (N.J. Super. Ct. Law Div. 1981) (formulating balancing test to evaluate whether to grant bill of discovery directed to a non-party); *Arcell v. Ashland Chem. Co.*, 378 A.2d 53, 71 (N.J. Super. Ct. Law Div. 1977) ("[T]he majority view is that modern rules and statutes relating to discovery do not abrogate equitable jurisdiction as to bills of discovery, and equity may be resorted to where effective discovery cannot be obtained under the rules or statutes."); *Leonard v. Latrobe Area Hosp.*, 549 A.2d 997, 999 (Pa. Super. Ct. 1988) ("A subpoena duces tecum or an independent action in equity against the non-parties."); *Wofford v. Ethyl Corp.*, 447 S.E.2d 187, 189 (S.C. 1994) ("[T]he plain language of [S.C. Rule Civ. Pro.] 34(c) recognizes that an independent discovery action may be maintained against a non-party.").

compelling production. Although the bill of discovery was mostly commonly used to obtain discovery, nothing about the bill of discovery limits the court's remedial powers to a production order. The Court of Chancery "has broad latitude to exercise its equitable powers to craft a remedy."[127] The court's remedial powers "are complete to fashion any form of equitable and monetary relief as may be appropriate" and "to grant such other relief as the facts of a particular case may dictate."[128] Put more poetically, the "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff."[129]

---

[127] *Hogg v. Walker*, 622 A.2d 648, 654 (Del. 1993); *accord Berger v. Pubco Corp.*, 976 A.2d 132, 139 (Del. 2009) ("[T]he Court of Chancery has broad discretion to craft an appropriate remedy . . . , the propriety of a court-ordered remedy is ordinarily reviewed for abuse of discretion." (footnote omitted)); *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, 961 A.2d 521, 525 (Del. 2008) ("The Court of Chancery has broad discretion to fashion equitable relief.").

[128] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983); *accord Whittington v. Dragon Gp. L.L.C.*, 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011) ("This Court, as a court of equity, has broad discretion to form an appropriate remedy for a particular wrong."); *McGovern v. Gen. Hldg., Inc.*, 2006 WL 1468850, at *24 (Del. Ch. May 18, 2006) ("The Supreme Court has emphasized the capacious remedial discretion of this court to address inequity."); *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001) ("[T]his Court, fortunately, has broad discretion to tailor remedies to suit the situation as it exists." (internal quotation marks omitted)). *See generally Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

[129] *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12, 1992) (Allen, C.).

The fact that an equitable claim or remedy was traditionally used one way does not limit equity's ability to adapt to new circumstances.[130]

> [T]he Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief.[131]

Equity "has an expansive power, to meet new exigencies; and the sole question, applicable to the point of jurisdiction, must from time to time be[] whether such rights and wrongs do exist, and whether the remedies [therefore] in other courts, and especially in the courts of common law, are full, and adequate to redress."[132]

Using the court's equitable powers to impose an injunction requiring preservation of the Claims Data would not be a stretch. The bill of discovery and sister mechanisms like the bill to perpetuate testimony[133] were used not just to obtain

---

[130] *See In re Carlisle Etcetera LLC*, 114 A.3d 592, 603 (Del. Ch. 2015) (rejecting notion that, "because the nascent practice of entity law as it existed at the time of the colonies' separation had not yet envisioned LLCs, they fall outside the domain of equity"); *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 491 n.13 (Del. Ch. 2022) (noting that the "exercise of a court's equity powers must be made on a case-by-case basis," with an "emphasi[s] [on] the need for flexibility"); *Holland v. Florida*, 560 U.S. 631, 649–50 (2010) (same).

[131] *Schoon v. Smith*, 953 A.2d 196, 204–05, 205 n.24 (Del. 2008) (quoting Pomeroy § 60).

[132] *Id.* at 206 (quoting Story § 53 (alterations in original)).

[133] Clark § 420–21 (noting bill to perpetuate testimony can be brought where plaintiff "fears [his legal right] may be injured in some way in some future litigation by loss of proof; and that he is not in a position to sue immediately at law."); *see also*

evidence but to preserve it.[134] An injunction requiring the preservation of evidence serves the same purpose.

Not surprisingly, courts in other jurisdictions have used the bill of discovery to require the preservation of evidence.[135] Research has not uncovered any decision holding or suggesting that an equitable bill of discovery could *not* support an order requiring the preservation of evidence.

The Claim Processors' argument against a preservation order also ignores the concept of lesser included authority. Ordering the preservation of documents is generally less intrusive than ordering the production of documents. It would be counterintuitive to envision that the court has the power to order the broader and

---

26B C.J.S. *Depositions* § 36 ("At equity, a bill to perpetuate testimony is an original bill in anticipation of litigation not instituted or when no suit at law can be instituted for their protection and preservation at the time the bill is filed." (footnote omitted)).

[134] Story § 1505 (citing the need to "preserve" evidence "in danger of being lost").

[135] *See Lewis v. Weaver,* 969 So.2d 586, 587–88 (Fla. App. Ct. 2007) (affirming trial court's order requiring a dock owner to preserve and allow inspection of a dock in its current condition under a bill of discovery; *and* noting that the order "may also avoid a spoliation claim later"); *Johnson v. Spartanburg Cnty. Sch. Dist. 7,* 2008 WL 9846826, at *1 (S.C. Ct. App. Oct. 27, 2008) (affirming grant of equitable bill of discovery and temporary injunction that required a school district to "maintain, preserve, and produce" evidence relating to an alleged sexual assault on a school bus); *see also* Jeffrey A. Parnes & Jessica Theodoratos, *Expanding Pre-Suit Discovery Production and Preservation Orders,* 2019 Mich. St. L. Rev. 651, 655 (2019) ("An equitable bill of discovery occasionally is employed to preserve other evidence"); 1 Fred Lane, *Lane Goldstein Trial Technique* § 6:1 n.2, Westlaw (3d ed. Database updated Sept. 2025) (discussing cases that permitted or denied pre-action discovery).

more intrusive relief of producing discovery yet not the authority to order the narrower and less intrusive relief of preserving discovery.

The Repeat Litigants ask the court to use a traditional tool of equity—the injunction—and apply it to a new circumstance. That is within the court's power.

### 5. The Contention That The Repeat Litigants Must Reopen The Bankruptcy Proceedings And Seek Relief There

Next, the Claim Processors assert that the Repeat Litigants have an adequate remedy at law because they can ask the bankruptcy courts who approved the settlement trusts to modify their terms to require that Claims Data be preserved. That is unnecessary, because there is no dispute over the terms of the settlement trusts, and no need to modify the agreements governing them. The Claim Processors already have the authority to preserve the Claims Data; they simply don't want to preserve it. Because the authority exists, there is no need to modify the trustee agreements. The Repeat Litigations challenge whether the trustees are properly exercising their authority. Just as this court can issue an injunction when directors have used their authority inequitably, without requiring the corporation to amend its certificate of incorporation to deprive the directors of the authority to act, so too can this court address the trustees' adoption of the Data Policies without an amendment to the trusts' governing agreements forbidding their implementation.

Sending the Repeat Litigants back to the bankruptcy courts is also not as "complete, practical and efficient"[136] as the remedy that this proceeding can provide. The bankruptcy proceedings are closed, so the Repeat Litigants would have to seek to reopen them. Because the bankruptcy courts have entered final orders, the Repeat Litigants likely would have to proceed under one of the narrow grounds contemplated by Federal Rule of Civil Procedure 60 or its bankruptcy analogs—and the Claim Processors doubtless would oppose that relief. The Repeat Litigants also would have to seek relief in each bankruptcy case, rather than the more direct route of filing this lone action seeking relief against the Claim Processors themselves. That circuitous process does not provide an adequate remedy at law.

### 6. The Contention That The Repeat Litigants Failed To Plead A Specific Claim For A Bill Of Discovery

Finally, the Claim Processors posit that even if a bill of discovery otherwise would be available, the Repeat Litigants cannot obtain one because they did not specifically ask for it in their original complaint. That argument seeks to resurrect the antiquated theory of pleading that the Federal Rules of Civil Procedure and the Court of Chancery Rules definitively rejected. A party need not use the term "bill of discovery" in its complaint for the court to hold that the allegations state a claim on which relief can be granted.[137]

---

[136] *Comdisco*, 602 A.2d at 78 (internal quotation marks omitted).

[137] *See Lubrin v. Hess Oil Virgin Islands Corp.*, 109 F.R.D. 403, 405 (D.V.I. 1986) ("Although Lubrin did not style his complaint as an equitable bill for discovery,

The contention that a plaintiff must plead specific causes of action hearkens back to the theory of the pleadings—i.e., the requirement that a plaintiff must plead a particular legal theory.[138] Under that approach, a complaint had to "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all."[139] Put differently, a plaintiff had to pick a legal theory at the outset of the case and stick with it.[140] If the facts did not support the theory, then the court would not grant relief, even if the facts established an entitlement to relief under a different theory.[141]

Through a combination of rules, the Federal Rules of Civil Procedure "effectively abolished the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."[142]

> Federal Rule of Civil Procedure 8(a) eliminates the concept of "cause of action"; Rule 8(d) provides that a party may set forth two or more statements of claim alternatively or hypothetically; [Rule] 15(b) deals a heavy blow to the doctrine by permitting amendments as late as the trial

he does request equitable injunctive relief seeking the equivalent result. We therefore find our result in accordance with the few decisions which exist on this subject.").

[138] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 469–70 (Del. Ch. 2024); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021).

[139] *See, e.g.*, *Mescall v. Tully*, 91 Ind. 96, 99 (1883).

[140] *See generally* Fleming James, Jr., *The Objective and Function of the Complaint Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961).

[141] *See id.*

[142] Wright & Miller § 1219 (footnote omitted).

and treating issues as if they had been raised in the pleadings when they are tried by the express or implied consent of the parties; and [Rule] 54(c) provides that, except in the case of a default judgment, the "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."[143]

The drafters of the Federal Rules consciously avoided references to pleading a "cause of action," a concept typical of prior pleading regimes.[144] Instead, the Federal Rules referred to a "claim" and required only "a short and plain statement of the claim showing that the pleader is entitled to relief."[145]

Through these efforts, the Federal Rules of Civil Procedure dispensed with the requirement to plead particular legal theories.[146] "The federal rules, and the decisions

---

[143] *Id.* (footnotes omitted).

[144] Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L. Rev. 909, 976 & n.387 (April 1987).

[145] *See* Fed. R. Civ. P. 8(a)(2), 12(b)(6).

[146] *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory."); Wright & Miller §§ 1218–19; *id.* § 1219 n.8 (collecting authority); *see, e.g.*, *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure rejected the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"); *Higgs v. Carver*, 286 F.3d 437 (7th Cir. 2002) (Posner, J.) ("All that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, non-legalistic) English, of the legal claim . . . . The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories."); *Rarick v. DeFrancesco*, 94 F. Supp. 2d 279, 286 (N.D.N.Y. 2000) ("A complaint need not state 'facts,' 'ultimate facts,' or even 'facts sufficient to constitute a cause of action.'"). The decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662

construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits."[147]

The Delaware courts embraced the new direction charted by the Federal Rules of Civil Procedure. "In 1948, the Courts of Delaware shook off the shackles of mediaeval [sic] scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules of Civil Procedure."[148] When commenting on the new rules, Judge Herrmann pointed out"[t]he de-emphasis upon pleadings and the re-emphasis upon ascertainment of truth is reflected in . . . the almost automatic amendment of pleadings. Under Rule 15(b), for example, if issues not raised by the pleadings are tried without objection, they are treated as though raised in the pleadings . . . ."[149]

---

(2009), elevated the federal pleading standard from reasonable conceivability to plausibility; they did not otherwise alter what a plaintiff must plead and do not affect this line of authority. *See Johnson*, 574 U.S. at 12. Regardless, the Delaware Supreme Court has rejected the plausibility standard adopted in *Twombly* and *Iqbal*, rendering those decisions irrelevant. *See Cent. Mortg.*, 27 A.3d at 537.

[147] Wright & Miller § 1219 n.14 (internal quotation marks omitted).

[148] Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) (internal quotation marks omitted).

[149] *Id.* at 338.

The Delaware Supreme Court has consistently re-affirmed the principle of notice pleading.[150]

Here, the complaint did not explicitly contain a request for a bill of discovery, but the allegations support such a claim, and that is what counts. The failure to request a bill of discovery explicitly did not prejudice the Claim Processors. They addressed the substance of the complaint's allegations in their opening and reply briefs, and the court entertained supplemental briefing on whether the bill of discovery provided a helpful framework for the case. The case can proceed past the pleading stage, and the Claim Processors can mount a defense.

## C. The Claim Processors' Arguments Against An Injunction

As their last Rule 12(b)(6) argument, the Claim Processors turn to the remedy, loudly proclaiming that the court cannot grant the injunction that the Repeat Litigants seek. A Rule 12(b)(6) motion challenges whether a plaintiff has stated a claim on which relief could be granted. The motion does not target the types of relief that a plaintiff might obtain. A court determines remedies after trial, so a pleading-stage assessment is usually premature.[151] Sometimes, ruling at the pleading stage on

---

[150] *See In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 54 (Del. 2022); *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013); *Cent. Mortg.*, 27 A.3d at 536–37; *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002).

[151] *E.g.*, *Delawareans for Educ. Opportunity v. Carney*, 199 A.3d 109, 178–79 (Del. Ch. 2018) (declining to rule on remedies at the pleading stage and writing that "[w]hether and what kind of remedy issues should be addressed at a future date."); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *17 (Del. Ch. Jan. 12, 2015) ("At the pleadings stage, the court will not rule out the

whether a remedy will be available can assist in the simplification of the case and the formulating of issues for trial, which are important parts of the trial court's case-management function.[152] This is not one of those cases.

In attacking the Repeat Litigants' request for an injunction, the Claim Processors repeatedly protest that the court cannot force them "to serve as a forever, free, lending library, holding highly sensitive data of individuals with no connection with, or claims against [the Repeat Litigants]."[153] Taken literally, that tendentious framing sounds persuasive, but the Repeat Litigants dispute the Claim Processors' characterizations. More importantly, this court has the power to tailor the remedy to the facts of the case. It also has the power to condition relief on undertakings necessary to make an award equitable. The court will not award a remedy that would be inequitable.

The Claim Processors also argue that a denial of their motions to dismiss will open the floodgates to bills of discovery seeking similar remedies. The "uniqueness of

possibility of other remedies, such as rescissory damages."); *see Ambac Assur. Corp. v. EMC Mortg. Corp.*, 2009 WL 734073, at *2 (S.D.N.Y. Mar. 16, 2009) (denying defendant's request to strike rescissory damages on the basis that it was premature); *Assured Guar. Mun. Corp. v. UBS Real Est. Secs., Inc.*, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) ("It would be premature to strike a remedy at the pleadings stage.").

[152] *See Goldstein v. Denner*, 310 A.3d 548, 569–71 (Del. Ch. Jan. 26, 2024) (discussing trial court's case management authority); *Sunder Energy, LLC v. Jackson*, 2023 WL 8868407, at *16 n.39 (Del. Ch. Dec. 22, 2023) (same); *Harris v. Harris*, 289 A.3d 310, 342–43 (Del. Ch. 2023) (same).

[153] Defs.' Suppl. Br. 1.

asbestos litigation and the challenges it presents to traditional court rules and legal principles is widely recognized."[154] To address the complex issues that asbestos litigation creates, the bankruptcy courts had to improvise, and Congress had to enact new legislation. Courts with high-volume asbestos dockets have implemented special discovery procedures, some of which concern Claims Data. The Trust Transparency Statutes recognize that Claims Data is unique.

This is a unique case. The nature of asbestos litigation and the role of the Claim Processors drives the outcome. The court's willingness to entertain this lawsuit does not suggest that other litigants will be able to state a claim for a bill of discovery, much less obtain a remedy.

Perhaps the Claim Processors' arguments about remedy will prove convincing; they remain free to make them at a later stage of the case. At this stage, the court is not deciding whether to issue an injunction. The court is only determining whether the case can proceed past the pleading stage. It can.

## V.    CONCLUSION

The Repeat Litigants have properly invoked this court's subject matter jurisdiction. They have adequately alleged facts to support standing. They have also stated a claim on which relief can be granted. The Claim Processors' motions to dismiss are denied.

---

[154] *In re Owens Corning*, 305 B.R. 175, 217 (Bankr. D. Del. 2004) (collecting cases and commentaries).